1  .

2                                                                              O

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10  ROBERTO CAMARENA,                    )    NO. EDCV 14-1672-MAN
                                         )
11              Plaintiff,               )
                                         )
12       v.                              )    MEMORANDUM OPINION
                                         )    AND ORDER
13  CAROLYN W. COLVIN,                   )
    Acting Commissioner of Social        )
14  Security,                            )
                                         )
15              Defendant.               )
                                         )
16  _____      )

17

18                         INTRODUCTION

19

20       Plaintiff filed a Complaint on August 12, 2014, seeking review of the denial of plaintiff's

21  application for disability insurance benefits ("DIB").  On April 17, 2015, the parties filed a Joint

22  Stipulation ("Joint Stip.") in which plaintiff seeks an order reversing the Commissioner's decision

23  and either remanding the matter for further administrative proceedings or ordering the payment

24  of benefits.  (Joint Stip. at 27.)  The Commissioner requests that the ALJ's decision be affirmed

25  or, in the alternative, that the case be remanded for further proceedings.  (*Id*. at 28-31.)  On April

26  22, 2015, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the

27  undersigned United States Magistrate Judge.  (Dkt. Nos. 15, 17.)  The Court has taken the matter

28

under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On June 14, 2011, plaintiff, then 51 years old,[1] applied for a period of disability and DIB. (Administrative Record ("A.R.") 139.)  Plaintiff alleged disability commencing April 11, 2011, due to impairment of his "neck/back/shoulder/rt elbow/wrists."  (A.R. 156; *see also id.* 186 (complaining of shoulder, neck, and spine pain).)  Plaintiff had previously worked as a shop mechanic.  (*Id.* 22, 157.)

The Commissioner denied plaintiff's application initially (A.R. 51-61) and on reconsideration (*id.* 63-72).  On November 15, 2011, plaintiff requested a hearing.  (*Id.* 92.)  On October 11, 2012, plaintiff, who was represented by counsel, testified before Administrative Law Judge Lynn Ginsberg ("ALJ").  (*Id.* 29-49.)  Gregory Jones, a vocational expert ("VE"), also testified.  (*Id.* 36-42; *see also id.* 131-32.)  On November 19, 2012, the ALJ issued an unfavorable decision, denying plaintiff's claim for DIB.  (*Id.* 10-24.)  On June 26, 2014, the Appeals Council denied plaintiff's request for review.  (*Id.* 1-3.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that plaintiff had not engaged in substantial gainful activity from the alleged onset date of April 11, 2011.  (A.R. 15.)  The ALJ further found that plaintiff had the following severe impairments:  "bilateral impingement syndrome with rotator cuff tendinitis of the shoulders; cervical spine degenerative disc disease, status post fusion; lumbosacral spine degenerative disc disease with radiculopathy, status post laminectomy; bilateral 'mild' carpal

---

[1] Plaintiff was born on April 29, 1960 (A.R. 139.)  Accordingly, plaintiff was categorized as "closely approaching advanced age" on the date of his application.  *See* 20 C.F.R. § 404.1563.

1   tunnel syndrome; and obesity." (*Id.*) The ALJ concluded that plaintiff's impairments do not satisfy

2   the requirements of a listed impairment in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R.

3   §§ 404.1520(d), 404.1525, 404.1526). (*Id.* 12-13.)

4

5       The ALJ determined that, through the date of her opinion, plaintiff had the residual

6   functional capacity ("RFC") to perform light work with the following limitations:

7

8       [Plaintiff] can lift and/or carry 15 pounds occasionally and 10 pounds frequently.

9       He can stand and/or walk for six hours out of an eight-hour workday with regular

10      breaks.  He can sit for six hours out of an eight-hour workday with regular breaks

11      but he needs to alternate positions every two hours.  He is limited to occasional

12      climbing of ramps and stairs, balancing, stooping, kneeling, and crouching but no

13      climbing ladders, ropes, or scaffolds.  He is limited to no to rare crawling.  He is

14      limited to occasional reaching overhead bilaterally.  He is limited to frequent

15      handling with the left upper extremity.  He can have no to rare exposure to

16      unprotected heights, to excessive vibration, and to the use of moving hazardous

17      machinery.  He is limited to simple routine repetitive tasks as a result of side effects

18      from medication.

19

20  (A.R. 16.)   The ALJ found that plaintiff as limited by his RFC was unable to perform his past

21  relevant work as a shop mechanic, but he could have performed other jobs that exist in significant

22  numbers in the national economy, including the jobs of production assembler (DOT 706.687-010),

23  electronics worker (DOT 726.687-010), and bench assembler (DOT 706.684-022).  (*Id.* 23.)

24  Accordingly, the ALJ found that plaintiff was not disabled.  (*Id.* 19.)

25

26                          **STANDARD OF REVIEW**

27

28      Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine

3

1    whether it is free from legal error and supported by substantial evidence in the record as a whole.
2    Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is 'more than a mere
3    scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might
4    accept as adequate to support a conclusion.'"  Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519,
5    522-23 (9th Cir. 2014) (internal citations omitted).  "Even when the evidence is susceptible to
6    more than one rational interpretation, we must uphold the ALJ's findings if they are supported by
7    inferences reasonably drawn from the record."  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir.
8    2012).

9

10    Although this Court cannot substitute its discretion for that of the Commissioner, the Court
11    nonetheless must review the record as a whole, "weighing both the evidence that supports and
12    the evidence that detracts from the [Commissioner's] conclusion."  Lingenfelter v. Astrue, 504
13    F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); Desrosiers v.
14    Sec'y of Health and Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for
15    determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."
16    Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

17

18    The Court will uphold the Commissioner's decision when the evidence is susceptible to
19    more than one rational interpretation.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).
20    However, the Court may review only the reasons stated by the ALJ in his decision "and may not
21    affirm the ALJ on a ground upon which he did not rely."  Orn, 495 F.3d at 630; see also Connett
22    v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  The Court will not reverse the Commissioner's
23    decision if it is based on harmless error, which exists only when it is "clear from the record that
24    an ALJ's error was 'inconsequential to the ultimate nondisability determination.'"  Robbins v. Soc.
25    Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r of Soc. Sec., 454 F.3d
26    1050, 1055 (9th Cir. 2006)); see also Carmickle v. Comm'r of Soc. Sec., 533 F.3d 1155, 1162 (9th
27    Cir. 2008).

28

**DISCUSSION**

Plaintiff alleges that the ALJ committed the following three errors:  (1) she improperly evaluated the opinion of plaintiff's treating physicians (Joint Stip. at 3-7); (2) she improperly evaluated plaintiff's subject symptom testimony (*id.* 15-21); and (3) she improperly relied on testimony by the VE that conflicted with the DOT (*id.* 25, 27).

I.     **The ALJ Improperly Accorded Greater Weight To The Opinions Of The Reviewing Physicians Than To The Opinions Of Plaintiff's Treating Physicians.**

The record reflects that plaintiff has a long history of neck, shoulder, and back impairments. Plaintiff, a mechanic, reportedly underwent neck surgery in the late 1990s (*see* A.R. 578, 585, 635), suffered an injury to his neck and shoulder in the Fall of 2009, when he removed a large wheel from a truck without the use of pneumatic tools (*see id.* 578, 609, 635), and experienced "increased pain" and tingling after being hit on the head by a rolling door at work in early January 2010 (*id.* 635).  Plaintiff initially received care from Dr. Gary A. Linnemann with the Pacific Medical Clinic, which is near plaintiff formerly worked, but his care was subsequently transferred to Dr. Hiromu Shoji, an orthopedic surgeon who specializes in shoulder and knee surgery.  (*Id.* 635, 672, 760.)  Dr. Shoji gave plaintiff injections into his right shoulder, requested physical therapy through plaintiff's workers' compensation insurance carrier, and referred plaintiff to his associate, Dr. Timothy Gray, an orthopedic surgeon specializing in spinal surgery, for a second opinion.  (*Id.* 635.)  In March 2012, plaintiff's care was transferred to Dr. Gray, following plaintiff's cervical fusion surgery.

Plaintiff contends that the ALJ improperly evaluated the opinions of Dr. Shoji and Dr. Gray

1    as well as the opinions of Dr. Luis Rivera and Dr. Hormoz Zahiri,[2] who examined plaintiff

2    repeatedly in connection with his workers' compensation claims.  As explained below, the ALJ did

3    not properly evaluate the opinions of Drs. Shoji and Gray, the two orthopedic surgeons who

4    treated plaintiff for his impairments over the course of several years.[3]

5

6                    **A.      The ALJ Improperly Evaluated The Opinion Of Dr. Shoji.**

7

8            On July 2, 2010, Dr. Shoji diagnosed plaintiff with rotator cuff tendinitis of the right

9    shoulder associated with acromioclavicular joint degeneration and degenerative disc disease of

10   the cervical spine at the C5-6 and C6-7 levels.  (A.R. 762.)  At that time, Dr. Shoji opined that

11   plaintiff could continue "modified work."  (*Id.*)  Following an August 11, 2010 MRI, which revealed

12   "disc bulging" at the C6-7 level that "abut[ted] upon and minimally deform[ed] the cervical cord"

13   and "encroachment upon the inferior aspect of the lateral recess bilaterally," Dr. Shoji

14   recommended that plaintiff be evaluated by Dr. Gray, because his neck symptoms appeared to

15   be worse and the MRI report of plaintiff's cervical spine also "appear[ed] to [have] worsened

16   compared to the prior report of May 7, 2010."  (*Id.* 740.)

17

18           On December 12, 2010, Dr Shoji limited plaintiff to light lifting and carrying (between five

19   and 15 pounds) and to light pushing and pulling (10-25 pounds) and to working no more than four

20   hours a day.  (A.R. 661.)  Dr. Shoji assessed these same limitations at plaintiff's December 20,

21   2010 appointment (*id.* 844), and his January 31, 2011 appointment (*id.* 560, 643, 803).  On

22   February 28, 2011, Dr. Shoji assessed the same limitations and also prohibited plaintiff from

23

24           [2]  The ALJ considered the April 26, 2011 and May 16, 2011 medical opinions signed by Dr.
25   Luis Rivera.  (A.R. 21; *see also id.* 515, 517.)  However, according to the parties, the May 16,
     2011 opinion was written by Dr. Hormoz Zahiri, not Dr. Rivera.  (*See* Joint Stip. at 5, 9 n.1.)

26           [3]  Because the ALJ committed reversible error in evaluating the opinions of Drs. Shoji and
27   Gray, it is not necessary for the Court to also determine whether the ALJ properly evaluated the
     opinions of Drs. Rivera and Zahiri.  However, on remand, the ALJ should re-evaluate the opinions
28   of plaintiff's numerous treating and examining physicians and, if she elects to discredit any
     portions of their opinions, she must articulate specific and legally sufficient reasons for doing so.

engaging in activities requiring the use of vibrating machines.  (*Id.* 550, 619.)

Finally, on April 11, 2011, the alleged date of the onset of plaintiff's disability, Dr. Shoji: indicated that plaintiff was "unable to perform activities of daily living at home or at work" (A.R. 526, 602); stated that plaintiff's symptoms had worsened while he had been on modified work and that plaintiff required "large doses of medication" to control his pain (*id.* 781, 782); and opined that plaintiff could no longer work, because the pain "prevents his activities of daily living at home or at work" (*id.* 782).  At plaintiff's subsequent appointments on May 9, 2011, June 6, 2011, and December 8, 2011, Dr. Shoji stated that plaintiff should remain on Total Temporary Disability status -- that is, off work.  (A.R. 779-80 - 5/9/11, 778 - 6/6/11, 838 - 12/8/11.)

Dr. Shoji's opinions conflicted with the opinions of the two State Agency physicians who reviewed plaintiff's medical records.  On August 1, 2011 -- almost four months after Dr. Shoji put plaintiff on Temporary Total Disability and still more than six months before plaintiff's surgery -- L. Schwartz, M.D., reviewed plaintiff's records and determined that plaintiff could perform light work.  (A.R. 54-60.)  Dr. Schwartz opined that plaintiff retained the functional capacity to:  lift and carry 15 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours in a normal work day, if given the opportunity to alternate positions every 2 hours; perform occasional postural work and frequent gross manipulation.  (*Id.* 55.)  However, Dr. Schwartz also found that plaintiff was limited in his ability to perform handling activities and reach overhead with his left arm.  (*Id.* 57-58.)  Less than three months after Dr. Schwartz's review of plaintiff's records, D. Chan, M.D., reviewed plaintiff's records and assessed plaintiff's residual functional capacity consistently with Dr. Schwartz's assessment, except that he found that plaintiff could lift and carry 20, rather than 15, pounds occasionally.  (*Id.* 68-69, 71 - 10/26/11.)

In her November 19, 2012 decision, the ALJ stated that she considered and gave "some weight" to Dr. Shoji's January 31, 2011 and February 28, 2011 opinions, which the ALJ described as "well-supported by the objective medical evidence" and "consistent with the record as a whole."

1   (A.R. 21.)   However, the ALJ gave "little weight" to the portions of these two opinions that
2   assessed plaintiff's ability to engage in pushing and pulling as limited, stating that "Dr. Shoji does
3   not provide any rationale for the pushing/pulling limitations and this limitation is not supported
4   by the medical record as a whole." (*Id.* 21.)   The ALJ did not address any of Dr. Shoji's opinions
5   dated on or after the alleged date of the onset of plaintiff's disability, *i.e.*, Dr. Shoji's April 11,
6   2011, May 9, 2011, June 6, 2011, and December 8, 2011 opinions that plaintiff could not work
7   or perform activities of daily living due to worsening symptoms and the high dosages of pain
8   medication necessary to control his pain.  (*See generally id.* 21; *see also id.* 526, 602, 778, 779-
9   80, 781-82, 838.)   In contrast, the ALJ accorded "great weight" to the opinions of the State
10  agency medical consultants, which the ALJ described as "consistent with the evidence as a whole."
11  (*Id.* 22.)

12

13        When a treating or examining physician's opinion is not contradicted by another physician,
14  it may be rejected only for "clear and convincing" reasons that are supported by substantial
15  evidence. Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Lester v. Chater, 81 F.3d
16  821, 830 (9th Cir. 1995). When, as here, it is contradicted by another doctor's opinion, a treating
17  or examining physician's opinion may only be rejected if, after considering the factors set out in
18  20 C.F.R. § 404.1527(c)(2)-(6) for evaluating medical opinions, the ALJ articulates "specific and
19  legitimate" reasons supported by substantial evidence in the record. Garrison, 759 F.3d at 1012;
20  Orn, 495 F.3d at 632.  "This is so because, even when contradicted, a treating or examining
21  physician's opinion is still owed deference and will often be "entitled to the greatest weight . . .
22  even if it does not meet the test for controlling weight." Garrison, 759 F.3d at 1012.  "[I]t follows
23  even more strongly that an ALJ cannot in [his or her] decision totally ignore a treating doctor and
24  his or her notes, without even mentioning them." Marsh v. Colvin, ___ F.3d ___, No. 12-17014,
25  2015 WL 4153858, *2 (9th Cir. July 11, 2015) (citing Garrison, 759 F.3d at 1012).

26

27        The ALJ's analysis of Dr. Shoji's opinions -- and her decision to accord greater weight to
28  the opinions of the reviewing physicians than to the opinions of Dr. Shoji, plaintiff's treating

physician of more than a year -- does not meet this standard.  Rather than providing specific reasons for discounting Dr. Shoji's opinions, the ALJ ignored Dr. Shoji's opinions regarding plaintiff's functional limitations on and after the date of the alleged onset of plaintiff's disability. As a result, the ALJ's decision provides no rationale for rejecting Dr. Shoji's opinion that, as of April 11, 2011, plaintiff's worsening symptoms and the severity of his pain precluded him from performing his activities of daily living at home and at work.

The Ninth Circuit has repeatedly found that "an ALJ errs when [s]he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it." *See e.g.*, Garrison, 79 F.3d at 1012-13 (citing Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996)); *see also* Marsh, 2015 WL 4153858, at *2.  Accordingly, because the ALJ did not provide specific and legitimate reasons for discounting Dr. Shoji's opinions regarding plaintiff's functional limitations on and after the alleged onset of his disability, the ALJ's decision must be reversed and remanded for proper consideration of Dr. Shoji's opinions.

## B.   The ALJ Improperly Evaluated The Opinion Of Dr. Gray.

On June 11, 2010, plaintiff saw Dr. Timothy Gray, Dr. Shoji's associate, for a spinal surgery consultation.  (A.R. 769.)  Plaintiff reported that his treatment to that date had included physical therapy, injections, and prescription painkillers and steroids including Medrol Dosepak, Ibuprofen, and Darvocet.  (*Id.* 770.)  Plaintiff stated that these medications had provided no more than partial, temporary relief.  (*Id.*)  He stated that his pain wakes him up at night and he cannot sleep on his right side.  (*Id.*)  Dr. Gray observed that plaintiff "tended to be guarded with neck movement, especially flexion and extension," and plaintiff reported tenderness to palpation posteriorily in the midline, to the right of the midline over the paraspinous musculature, the trapezial ridge to the right, and "exquisite tenderness of the acromioclavicular joint as as subacromial space of the right shoulder."  (*Id.* 773.)  Dr. Gray observed that plaintiff had limited range of motion of his neck and right shoulder and demonstrated difficulty reaching behind his

1   back due to shoulder pain.  (*Id.*)  Plaintiff also had mild irritability of the median nerve on

2   palpation of his left wrist.  (*Id.*)  Dr. Gray diagnosed plaintiff with:   "Posterior neck pain,

3   myofascial versus facetogenic"; "right shoulder pain with the following components:  symptomatic

4   acromioclavicular arthritis; probable subacromial bursitis'"; and "mild left carpal tunnel syndrome."

5   (*Id.*)

6

7          Plaintiff saw Dr. Gray again on September 1, 2010, after Dr. Shoji observed worsening of

8   the disc protrusion at C6-7 on plaintiff's August 11, 2010 MRI report.  (A.R. 571, 735-36.)  Plaintiff

9   reported increased pain (*id.* 571) and stated that "the longer he is up the more his neck will

10  bother him" (*id.* 736).  He described his pain as "dreadful" -- a six on a pain scale of ten -- and

11  "sometimes horrible," a seven or eight on a pain scale of ten.  (*Id.* 572.)  Dr. Gray performed a

12  physical examination.  (*Id.* 571, 736.)  Dr. Gray observed that plaintiff is "very guarded in neck

13  motion" and "tends to tilt his neck slightly forward." (*Id.* 736.)  "Extension and rotation to the

14  right recreates pain down the right shoulder and arm.  Extension to the left recreates pain into

15  the left trapezius and parascapular area.  This is considered a positive Spurling's test."  (*Id.* 736.)

16  Dr. Gray reviewed plaintiff's August 11, 2010 MRI, noting that "[a]t C6-7 there is bilobilular disc

17  protrusion" that "abuts upon and minimally deforms the cervical spinal cord" and "[t]here is lateral

18  recess narrowing to the left." (*Id.*)  Dr. Gray recommended cervical disc replacement surgery (*id.*

19  571), agreed with Dr. Shoji that plaintiff's neck should be treated before his shoulder and rotator

20  cuff, because "when the patient is asleep for position for arthroscopy there can be some traction

21  on the neck that can aggravate the situation" (*id.* 736), and referred plaintiff to Dr. Darren Bergey,

22  because Dr. Bergey had experience performing cervical disc replacement surgery (*see id.* 622,

23  666, 672, 691).  Dr. Bergey, in turn, recommended that plaintiff undergo diagnostic discogram

24  before receiving a surgical recommendation.  (*See id.* 674, 804-06, 808-10.)

25

26          The record shows that, following Dr. Bergey's recommendation, plaintiff requested

27  authorization from his workers' compensation carrier for a diagnostic discogram, but his request

28  was repeatedly denied.  (*See* A.R. 820; *see also id.* 804-06, 808-10 (on January 12 and 27, 2011,

1    Dr. Bergey wrote letters of medical necessity, challenging the decision of plaintiff's workers'
2    compensation carrier to not certify the cervical discogram).)  On December 7, 2011, a Qualified
3    Medical Examiner, Dr. Ronald Levey, a board certified orthopedic surgeon, determined, *inter alia*,
4    that "it would be appropriate" for plaintiff to have a discogram but that, contrary to Dr. Gray's
5    recommendation, plaintiff was too old for cervical disc replacement surgery and instead was a
6    candidate for cervical fusion surgery.  (*Id.* 814-24.)

7

8    On January 11, 2012, following Dr. Levey's report, Dr. Gray evaluated plaintiff again.  (A.R.
9    831-36.)  Because Dr. Levey felt that plaintiff was a candidate for cervical fusion, Dr. Gray
10   recommended that plaintiff receive a new MRI of the cervical spine and, if the MRI revealed
11   significant degeneration at the C5-6 level, then undergo a discectomy with interbody fusion.  (*Id.*
12   835.)

13

14   On January 31, 2012, per Dr. Gray's recommendation, plaintiff received a new MRI (*see*
15   A.R. 840-42) and saw Dr. Gray for follow up on February 15, 2012 (*id.* 825-27).  Plaintiff reported
16   continuing posterior neck pain, pain radiating to both shoulders, numbness and tingling down both
17   arms, predominantly in a C6 distribution, as well as pain in his legs.  (*Id.* 825.)  Plaintiff's
18   medications included hydromorphone, Neurontin and Temazepam.  (*Id.* 825.)  Dr. Gray observed
19   that the MRI showed a "significant" degenerative protrusion of the disc at the C5-6 level that
20   touches the spinal cord and a bilateral foraminal narrowing.  (*Id.* 826.)  Dr. Gray stated that this
21   MRI shows there are "significant changes at C5-6 [that] cannot be overlooked."  (*Id.* 826.)  Dr.
22   Gray recommended that plaintiff undergo hardware removal at C4-5 with anterior C5-6, C6-7
23   discectomy with interbody fusion and a soft cervical collar for postoperative immobilization.  (*Id.*
24   826.)  Dr. Gray stated that plaintiff remained temporarily totally disabled.  (*Id.* 827.)

25

26   On March 28, 2012, plaintiff was admitted to the hospital for cervical fusion surgery.  (A.R.
27   846-55, 857.)  Dr. Gray stated that plaintiff's symptoms had worsened between his initial
28   evaluation in June 2010, and his hospitalization for surgery in March 2012.  (*Id.* 849.)  "Over time

1  there has been more diffuse progression of symptomatology.  It is possible the symptoms he is

2  experiencing in his legs is related to the neck as well." (*Id.* 849.)  Dr. Gray stated that, following

3  plaintiff's surgery, plaintiff would have a soft collar and patient controlled analgesia and would not

4  be discharged until his pain was controlled with oral medications and plaintiff could eat and

5  swallow sufficiently.  (*Id.*)  The record shows that the surgery was successful and plaintiff was

6  discharged from the hospital on April 1, 2012.  (*Id.* 857.)

7

8         On May 22, 2012, plaintiff saw Dr. Gray for a follow up appointment.  (A.R. 857.)  Plaintiff

9  reported a "very high" pain level, "constant" pain in his left neck and arm, daily moderate-to-

10  severe headaches starting at the base of his left neck, and an inability to sleep for more than

11  three to four hours at a time due to the pain.  (*Id.*)  Dr. Gray observed that plaintiff's range of

12  motion in any direction was very tight and restricted.  (*Id.* 857.)  Dr. Gray opined that, although

13  plaintiff had a "fair to good prognosis for recovery," he did not expect plaintiff to be able to return

14  to his previous work.  (*Id.* 856 - 5/25/2012 Medical Management Progress Report.)  Plaintiff's

15  treatment plan included prescription medication and requests for physical therapy, electrical nerve

16  stimulation, and continuing his Temporary Total Disability status.  (*Id.*)  Plaintiff's prescriptions

17  included Valium, Dilaudid, Cymbalta, Restoril (Temazepam), and the anti-inflammatory Mobic. (*Id.*

18  857.)  Dr. Gray did not expect plaintiff to demonstrate "maximum medical improvement" until a

19  full year after the surgery.  (*Id.* 858.)

20

21         The ALJ did not mention the opinions and treating notes of Dr. Gray.  (*See generally* A.R.

22  16-22.)  As stated above, "an ALJ cannot in its decision totally ignore a treating doctor and his or

23  her notes, without even mentioning them." Marsh, 2015 WL 4153858, at *2.  Accordingly, the

24  the ALJ erred by finding plaintiff non-disabled without considering Dr. Gray's opinions and treating

25  notes, and the ALJ's decision must be reversed and remanded for proper consideration of Dr.

26  Gray's opinions and treatment records.

27  \\

28  \\

## II.  **The ALJ Improperly Assessed The Credibility Of Plaintiff's Subjective Symptom Testimony.**

Plaintiff's next contention is that the ALJ improperly evaluated plaintiff's subject symptom testimony.  (Joint Stip. 15-21.)  In his June 30, 2011 Function Report, which plaintiff completed nine months before his surgery, plaintiff stated that each day he gets up "very slowly," brushes his teeth, makes a cup of coffee, lies down, and then gets up only to use the restroom.  (A.R. 176.)  He stated that, before the alleged onset of his disability, he used to cook full course meals every day, work around the house, go to work for up to ten hours a day, walk long distances on a treadmill, and swim for an hour a day.  (*Id.* 177, 178, 180.)  Plaintiff added that, after the onset of his impairments, he was unable to cook more than a fruit smoothie once a week, swim, or use the treadmill, and the only "hobby" he was still able to perform was watching TV.  (*Id.* 178, 180.)  Plaintiff stated that he could not lift more than 15 pounds, walk more than 15 minutes, sit more than five minutes, or stand more than five minutes, and that he experienced difficulty bending, climbing stairs, and using his hands.  (*Id.* 181.)

Plaintiff's 2011 Function Report indicates that, following the alleged onset of disability, he relied heavily on his wife and daughter to help him perform his daily activities.  He stated that he needed help putting on his shoes and washing his back and feet. (A.R. 177.)  Similarly, his wife and daughter did everything around the house, although about once a week he took out a small trash bag, if no one was there to help him.  (*Id.* 178.)  He stated that he tried to avoid house and yard work, because it caused pain that sometimes lasted for days.  (*Id.* 179.)  He similarly tried to avoid shopping, but about once a month, he went shopping with his wife or daughter even though doing so was "very hard."  (*Id.*)  Plaintiff also stated that he made the "sacrifice" of trying to go to church for a one hour mass once a week, even though it was painful, and sometimes took his wife for a "not too long dinner," but otherwise he stayed at home resting.  (*Id.*)  He stated that he could not drive and sometimes could not "think right" because of his medications.  (*Id.* 179, 180.)  He stated that he feared he might kill himself due to the pain.  (*Id.* 182.)

13

At the October 11, 2012 hearing, approximately six months after plaintiff's cervical fusion surgery, plaintiff testified that, to control the pain, he lays down at a 45 degree angle with lots of cushions and takes hydromorphone every four to six hours.  (A.R. 42-43.)  He spends most of his days laying down.  (*Id.* 44.)  He gets up to make himself a drink, make a ham or butter sandwich, and to walk around the house for no more than 15 minutes -- at which point "it's difficult" to continue walking and he is afraid of falling.  (*Id.* 44. 46.)  He testified that using an assistive device made his wrists and shoulders "worse" and that he is still unable to do his former hobbies, which included yard work, cleaning the swimming pool, and fixing things around the house.  (*Id.* 45.)  Plaintiff further testified that he does not go in the pool during the day, does not do any type of physical therapy, and only "rarely" takes naps during the day, and that he had used a TENS unit for a month but it was "canceled," because it did not provide relief.  (*Id.*)

Plaintiff further testified that he has difficulty sleeping and, even with the help of sleeping pills, can only sleep for three to four hours a night.  (A.R. 46-47.)  He testified that he has a hard time gripping, grasping, or holding on to things with his right hand, which is his dominant hand, and experiences pain opening a jar of jelly -- although, before his surgery, he was unable to open such jars.  (*Id.* 47, 48.)  In a typical seven day period, he does not have a single good day, and without medication, he cannot tolerate his pain level.  (*Id.* 47-48.)  With the medication, he can physically tolerate the pain but sometimes finds it emotionally difficult and can "start getting anxious" or start thinking about "ending everything."  (*Id.* 48.)  Plaintiff testified that his Cymbalta prescription "seemed to help" with those thoughts.  (*Id.*)

When assessing whether a plaintiff's pain or symptom testimony is credible, the ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Treichler v. Comm'r of Soc. Sec., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)).  Second, the ALJ must make specific cogent findings that are supported by substantial evidence for discounting the plaintiff's credibility, findings that

1   are "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's
2   testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony."[4]  *See*
3   Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal citations and quotations omitted);
4   *see also* Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (any conclusion that the claimant's
5   complaints are less than credible be supported by "specific, cogent findings"); Social Security
6   Ruling 96-7p.  The ALJ must "specifically identify the testimony [from a claimant] she or he finds
7   not to be credible and . . . explain what evidence undermines the testimony."  Treichler, 775 F.3d
8   at 1102 (quoting Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001)).  "[S]ubjective pain
9   testimony cannot be rejected on the sole ground that it is not fully corroborated by objective
10  medical evidence."[5]  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted).
11  However, a finding of malingering that is supported by substantial evidence is sufficient to support
12  an adverse credibility determination.  *See* Chavez v. Astrue, No. CV 11-10643-RNB, 2012 WL
13  6042859, *2 (C.D. Cal. Dec. 3, 2012) (citing Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir.
14  2003); LaGrand v. Comm'r Soc. Sec. Admin. 379 Fed. Appx. 555, 556 (9th Cir. 2010); Flores v.
15  Comm'r Soc. Sec. Admin, 237 Fed. Appx. 251, 252-53 (9th Cir. 2007)).

16

17        Here, the ALJ found that plaintiff's allegations were less than fully credible, because:  (1)
18  Dr. Levey, the Qualified Medical Examiner, asserted that plaintiff's subjective complaints "are way
19  out of proportion to the trauma incurred" and there was "considerable magnification of
20  symptomatology" (A.R. 17); (2) plaintiff rescheduled his shoulder surgery in September 2010 --
21  7 months before the alleged onset of his disability -- so that he could go on vacation (*id.* 18); (3)
22  the objective findings did not support plaintiff's allegations of disabling pain in his hands (*id.*); and
23  (4) plaintiff's activities of daily living entail physical and mental abilities and social interactions that
24  are the same as those necessary for obtaining and maintaining employment and inconsistent with

25

26        [4]  In the absence of an ALJ's reliance on evidence of "malingering," the ALJ's reasons for
    discounting the plaintiff's testimony must be "clear and convincing" and supported by substantial
27  evidence.  Treichler, 775 F.3d at 1102, 1103.

28        [5]  Nevertheless, the medical evidence is still a relevant factor in determining the severity
    of the claimant's pain and its disabling effects.  Rollins, 261 F.3d at 857.

1   the presence of an incapacitating condition (*id.*).  However, the ALJ's reasons for discounting

2   plaintiff's complaints, including her determination that the credibility of plaintiff's allegations were

3   "diminished [by] evidence of symptom exaggeration and malingering reflected in the file," are not

4   specific, cogent reasons supported by substantial evidence and, thus, are not sufficient to support

5   her adverse credibility determination.

6

7          First, the ALJ's finding of malingering is not supported by substantial evidence in the

8   record.  The nearly 900 page record contains treatment notes from multiple examining and

9   treating physicians, including voluminous treatment records from Dr. Shoji and Dr. Gray, both of

10  whom began treating plaintiff in the summer of 2010, approximately a year before the alleged

11  onset date and two years before plaintiff's surgery.  Out of that record, the only evidence of

12  malingering is a few isolated statements in Dr. Levey's report,[6] which Dr. Levey made after

13  conducting a single 55-minute examination of plaintiff to determine what medical procedures

14  should be certified by his workers' compensation carrier.  (*See* A.R. 814.)  Plaintiff contends that

15  Dr. Levey erred by: (1) interpreting plaintiff's "almost Trendelenb[u]rg" gait and inability to obtain

16  effective pain relief as evidence of malingering (Joint Stip. at 16 (the "Trendelenberg gait pattern

17  suggested by Dr. Levey is consistent with lumbar radiculpathy of the L5 nerve root distribution");

18  *id.* at 17 ("[c]oncerning the 'totally inappropriate response' regarding the effectiveness of the pain

19  medications as alleged by Dr. Levey, even the doctor acknowledged that this is explained by the

20  fact [plaintiff] 'may have become resistant to the morphine'")); and (2) failing to describe any

21  actual noncompliance with the physical examination (*id.* 17).  The Court need not consider the

22  correctness of Dr. Levey's medical conclusions however, because Dr. Levey's references to

23  symptom exaggeration are the only evidence in the 886 page record that support the ALJ's

24  findings of malingering.  As stated above, the Court must review the record as a whole, "weighing

25

26  ───────────────

27        [6] Specifically, the ALJ observed that, according Dr. Levey:  plaintiff's complaints were "way
    out of proportion to the trauma incurred"; there was "considerable magnification of
    sympomatology"; plaintiff's statement that his medications provided only transient relief was
28  "totally inappropriate"; plaintiff walked with a "contrived" gait; and plaintiff was noncompliant
    during portions of the physical examination.  (A.R. 17.)

1   both the evidence that supports and the evidence that detracts from the [Commissioner's]

2   conclusion."  Lingenfelter, 504 F.3d at 1035.  In the light of the record as a whole, there is

3   nothing more than a "scintilla" of evidence to support the ALJ's conclusion that plaintiff is a

4   malingerer.  See Gutierrez, 740 F.3d at 522-23; see also Orn, 495 F.3d at 630 (court "may not

5   affirm simply by isolating a 'specific quantum of supporting evidence'").  Accordingly, the ALJ's

6   first reason for diminishing plaintiff's credibility fails, because it is not supported by substantial

7   evidence.

8

9   Second, the fact that, in September 2010, plaintiff rescheduled his shoulder surgery does

10  not detract from the credibility of plaintiff's statements about the severity and limiting effects of

11  his impairments more than 7 months later after the alleged date of the onset of his disability.

12  As discussed above, the objective evidence shows that plaintiff's condition worsened over time.

13  Further, Dr. Shoji stated that the decision to delay plaintiff's shoulder surgery to accommodate

14  his own surgery schedule as well as plaintiff's vacation would not be problematic.  (A.R. 762.)

15

16  Third, to the extent that there is substantial evidence in the record to support the ALJ's

17  determination that the objective medical evidence is inconsistent with plaintiff's allegations of

18  disabling pain in his hands, this is not a cogent for discounting plaintiff's testimony that plaintiff's

19  neck and back pain was disabling.  Indeed, the ALJ stated that she used this inconsistency only

20  to assess the credibility of plaintiff's allegations regarding the severity of his carpal tunnel

21  syndrome.  Further, as stated above, "subjective pain testimony cannot be rejected on the sole

22  ground that it is not fully corroborated by objective medical evidence."  Rollins, 261 F.3d at 857

23  (citation omitted).  Accordingly, to the extent that the objective medical evidence is the ALJ's only

24  cogent reason for discounting plaintiff's testimony regarding the pain in his hands, it is not legally

25  sufficient to support the ALJ's adverse credibility determination.

26

27  Fourth, the ALJ misstated plaintiff's self-reported activities of daily living when she claimed

28  that plaintiff reported:  "driving a car; shopping for groceries; preparing simple meals; attending

17

1    church; and going to dinner." (*See* A.R. 18.)  Plaintiff, in both his June 30, 2011 Function Report

2    and October 11, 2012 hearing testimony, stated that he was unable to drive.  (*Id.* 43, 179.)  He

3    also stated that he found shopping "very hard," tried to avoid it, and only went shopping when

4    necessary -- about once a month -- and, even then, had to be accompanied by either his wife or

5    his daughter.  (*Id.* 179.)  Plaintiff also indicated that his ability to cook had been destroyed by his

6    disability, which left him unable to prepare anything more than "fruit smoothies" before the

7    surgery (*id.* 178) and butter or ham sandwiches after the surgery (*id.* 46).  He also testified that,

8    although he was physically able to open a jam jar after his surgery, doing so was painful.  (*Id.*

9    47.)  Finally, plaintiff described his commitment to going to a one-hour mass on a weekly basis

10   as a "sacrifice" that he tried to make even though it was "painful" and indicated that although he

11   took his wife out for "not too long" dinners on the occasions when he felt "ok," he otherwise

12   stayed inside his home resting.  (*Id.* 179.)  Thus, the ALJ's description of plaintiff's activities of

13   daily living is not supported by substantial evidence, and the conclusions that she drew from those

14   activities similarly lacks support in the record.  To the contrary, plaintiff's activities of daily living,

15   as actually reported, were generally consistent with plaintiff's subjective symptom testimony and

16   Dr. Shoji's opinion that, as plaintiff's condition worsened, he became unable to engage in both

17   work and activities of daily living.[7]  Accordingly, the ALJ erred in citing plaintiff's daily activities as

18   a reason for discounting plaintiff's subjective symptom testimony.

19

20   **III.    Remand Is Warranted**

21

22          In sum, the ALJ failed to adequately address the opinions of plaintiff's treating physicians

23   and failed to articulate legally sufficient reasons supported by substantial evidence for discounting

24   _____

25          [7]  It is also not clear that, even if accurate, the ALJ's description of plaintiff's daily activities
     would be a cogent reason for finding plaintiff's testimony less than credible.  *Cf.* Vertigan v. Halter,

26   260 F.3d 1044, 1050 (9th Cir. 2001) (noting that the "mere fact that a plaintiff has carried on
     certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise,

27   does not in any way detract from her credibility as to her overall disability"); Smolen, 80 F.3d at
     1283 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be

28   eligible for benefits, and many home activities may not be easily transferable to a work
     environment where it might be impossible to rest periodically or take medication.").

1   plaintiff's subjective symptom testimony.  Given the ALJ's errors and failure to articulate findings
2   that were supported by substantial evidence in the record, this matter must be remanded.  The
3   decision whether to remand for further proceedings or order an immediate award of benefits is
4   within the district court's discretion.  Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000).
5   Under the credit-as-true rule, a district court should remand for an award of benefits when the
6   following three conditions are satisfied:  "(1) the record has been fully developed and further
7   administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally
8   sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3)
9   if the improperly discredited evidence were credited as true, the ALJ would be required to find the
10  claimant disabled on remand."  Garrison, 759 F.3d at 1020.  The third of these conditions
11  "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no
12  outstanding issues that must be resolved before a determination of disability can be made."  Id.
13  n.26; see also Harman, 211 F.3d at 1179-81 (where there are outstanding issues that must be
14  resolved before a determination of disability can be made, and it is not clear from the record that
15  the ALJ would be required to find the claimant disabled if all the evidence were properly
16  evaluated, remand is appropriate).

17

18          Here, the Court strongly suspects that, if the statements that the ALJ improperly discounted
19  -- namely, those of Dr. Shoji, Dr. Gray, and plaintiff -- were credited as true, plaintiff would be
20  found disabled.  However, the ALJ did not ask -- and the VE did not address -- whether an
21  individual with the symptoms and limitations described by Dr. Shoji, Dr. Gray, and plaintiff could
22  perform jobs that exist in significant numbers in the national economy.  Further, the ALJ made
23  no findings regarding plaintiff's medical improvement following his March 2012 surgery and, thus,
24  questions remain about the duration of plaintiff's period of disability.  For these reasons, the Court
25  finds that there are outstanding issues that must be resolved before a determination of disability
26  can be made.  Accordingly, the Court remands for further development of the record, including
27  the proper consideration of the treating physicians' records and opinions and plaintiff's testimony
28  and an assessment of the duration of plaintiff's period of disability.  Cf. Garrison, 759 F.3d at 1021

(where "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled," the court retains flexibility to remand for further proceedings even though all conditions of the credit-as-true rule are satisfied); *see also* Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).

Finally, because the Court remands on the grounds described above, the Court declines to reach plaintiff's contention that the  ALJ failed to reconcile an inconsistency between the DOT and the VE's testimony that plaintiff could perform jobs requiring Reasoning Level 2, despite his limitation to "simple routine repetitive tasks."  Nevertheless, on remand, the ALJ should ensure that she explicitly identifies and resolves any apparent inconsistency between the VE's testimony that an individual with plaintiff's RFC could perform a particular job and the DOT's description of that job.  *See, e.g.*, Zavalin v. Colvin, 778 F.3d 842, 845-47 (9th Cir. 2015) (determining that the ALJ erred by failing to recognize the inconsistency between a plaintiff's limitation to "simple and routine work tasks" and the VE's testimony that plaintiff could perform a job that, according to the DOT, required Reasoning Level 3).

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

20

## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED: July 24, 2015

_____
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

21